147 So. 354

WESTERN UNION TELEGRAPH CO. v.
DAMPSKIBS AKTIESELSKABET
MAI et al.

No. 31923.

March 27, 1933.

See, also, 147 So. 26.

Bond, Curtis, Hall & Foster, of New Orleans, for appellant New Orleans Coal & Bisso Towboat Co.

John D., M. A. & Edwin H. Grace, of New Orleans, for appellant Dampskibs Aktieselskabet Mai.

Terriberry, Young, Rault & Carroll, of New Orleans, for appellee.

LAND, Justice.

Western Union Telegraph Company owns and operates a cable 3,200 feet in length across the bottom of the Mississippi river from Jackson avenue, New Orleans, La., to Copernicus avenue, Gretna, La.

Plaintiff company alleges that: "On March 12, 1927, at or about the hour of 2 p. m. the Steamship 'Mai,' navigating in conjunction with and assisted by the Tug 'A. L. Bisso,' dropped her anchor at a point in the Mississippi River, a few feet above the line of Plaintiff's said cable, and said Steamship 'Mai,' and said Tug 'A. L. Bisso,' thereupon moved and/or dragged said anchor causing it to become entangled in and break the aforesaid cable of Plaintiff." Pet. art. VI.

Plaintiff further alleges that "Said accident was caused by the joint negligence of the officers and crew of the said Steamship 'Mai' and of the said Tug 'A. L. Bisso' in dropping, or causing to be dropped, said anchor at the point aforesaid, and/or in dragging said anchor, or causing same to be dragged in said vicinity." Pet. art. XII.

Plaintiff finally alleges: "That, as a result of the accident aforesaid, Plaintiff's cable was rendered worthless and beyond repair and that it was necessary therefore for Plain-

tiff to lay at once a new cable in order to restore telegraphic communication." Pet. art. XV.

Plaintiff prays for damages in solido against defendant steamship company and New Orleans Coal & Bisso Towboat Company, Inc., in the sum of $4,291.85, the expense of laying a new cable.

Judgment for damages was rendered in favor of plaintiff against defendant companies in solido in the amount prayed for, and from this judgment defendants have appealed.

1. There is no dispute that the Mai was picked up by the tug A. L. Bisso at the public coal tipple at Nashville avenue, and that the tug towed the ship down the river and docked her at the upper end of First street wharf. It is also undisputed that, in order to dock the ship with bow upstream, the tug had to turn the ship around in the river, and that an anchor of the Mai was dropped to assist in this maneuver.

2. However, a controversy arises as to the exact place where the anchor was dropped, as to whether the ship drifted and dragged her anchor, and, if so, whether she drifted past the cable landing, which is immediately above the ferry landing at the foot of Jackson avenue.

In order to appreciate the testimony of the various witnesses as to these issues, a proper understanding of the locality becomes indispensable.

Going upstream from the ferry landing, at the foot of Jackson avenue, is an open wharf extending 164 feet to the lower edge of the covered wharf known as First street shed. On the day of the alleged accident to the ca-

ble, the fire boat Deluge was berthed in this open space. From its lower end to the fire wall that separates it from Third street wharf is a distance of 800 feet. The Third street wharf is 900 feet long, and then comes the Sixth street shed, which is 1,220 feet in length. The distances given are actual measurements made by the witness Tyler. Tr. 183, 184.

The Mineola, of the Nosa Line, was docked at the lower end of the First street shed towards Jackson avenue and above the Deluge. The Edam was docked at the Third street wharf, and the Mai was berthed at the upper end of First street shed, between the Mineola and the Edam, about 30 or 40 feet below the Edam. See McNulty, Tr. 148, 151; Tyler, Tr. 184, 135.

The plaintiff's cable came in just above the Jackson avenue ferry, about the lower end of the open 164-foot wharf, or about the stern of the Deluge, that was docked there at the date of the alleged accident. See Rhodes, Tr. 177.

It is therefore clear that, when the Mai docked, her bow was over 800 feet above the Jackson avenue ferry landing and the Western Union cable.

3. Now as to the movements of the tug and the Mai.

It is a remarkable fact that, out of a number of witnesses who have testified in the case, the plaintiff has been able to find only one witness, Nicholas Noriea, mate on the fire boat Deluge, who stated that, after the ship dropped her anchor, the tug and its tow drifted 100 feet below the Jackson avenue ferry landing, and necessarily more than that

distance below the cable, which is just above that landing. Tr. 98.

This witness claims that he was aboard the Deluge at the time the ship and the tug drifted below the ferry landing. His testimony, however, is flatly contradicted by every one of defendant's witnesses, who saw the movements of these vessels on the day of the alleged accident.

Especially strong and convincing is the testimony of Captain Rhodes, the ferry master, who testified that his ferry was tied up at the Jackson avenue landing at the time in question, and that he was in the pilot house, and is positive that no ship drifted down below the ferry. "We always watch those ships," the witness said, "when they are rounding up that way, to keep from getting in the way of them." Tr. 176, 177, 178.

Joseph W. Tyler, superintendent of defendant company's tugs, was on the wharf watching the movements of the Mai, as he had orders for the captain of the A. L. Bisso tugboat. He testified that the Mai drifted down, after anchor was dropped, within about 400 or 500 feet above the Jackson avenue ferry landing. Tr. 183.

Roger O. Damonte, deck hand on the A. L. Bisso tugboat, states that 175 or 200 feet above the Deluge landing was as far as the Mai drifted down towards Jackson avenue ferry landing. Tr. 142.

Damonte is corroborated by the testimony of Clarence Williams, another deck hand on the A. L. Bisso tugboat. Tr. 140.

Rogers William Damonte, chief engineer of the tug A. L. Bisso, states positively that the stern of the Mai, before being docked, at no time went below the fire tug Deluge, and was docked about 250 feet above the Deluge, as there was another ship (Mineola) in berth ahead of the Deluge. Tr. 132, 134.

Wilbest Thomas, fireman on the tug A. L. Bisso, was not in a situation to know anything about the alleged accident, as he could not see from the fire room anything taking place on the outside.

Defendant coal and towboat company was not able to obtain any other witness from the tug A. L. Bisso, since the mate, a deck hand, a coal passer, and a night fireman could not be served as witnesses, because of absence, and the captain and the cook of the tug had died.

The captain and crew of the Mai had also sailed away, when the vessel was released from seizure in this case.

In our opinion, a fair preponderance of the evidence in the case is in favor of defendants on the proposition that the ship and tug never, at any time, reached the cable line, and therefore the cable itself never came in contact with the ship's anchor and could not have been cut, bent, broken, or crushed thereby.

4. W. H. Anderson, maintenance foreman for plaintiff, admits that an attempt was made under his supervision to under-run or pick up the cable, and that, after getting out into the river approximately 300 feet, they could get no further, as the cable was hung up with some obstruction of some kind, and, for this reason, they had to abandon it and make arrangements to lay a new cable. Tr. 59, 60.

As a matter of fact, a diver, Captain Fritz John, was in the boat under-running the cable, but he was not sent down to examine it to see what the real trouble was, although he testified that he thought it possible for him to have dived on the day of the accident at Jackson avenue ferry landing. Tr. 194.

His testimony is as follows:

"Q. Now, did anybody ask you whether it was possible for you to dive in the river owing to flood conditions prevailing at that time?

"A. No, sir. If anybody asked me, I would have tried. I would have tried to go down there. I never did tell nobody I couldn't go down. I am going to try, anyhow.

"Q. Is is possible for you to dive in the river at the stage it is now?

"A. Yes, sir.

"Q. Off Jackson Avenue?

"A. Yes, sir. I have been there Sunday.

"The Court: Q. You did dive Sunday?

"A. Yes, sir, right there at Algiers Wharf. A gentleman got drowned." Tr. 193.

The maintenance foreman of plaintiff never recovered the injured cable, never examined it, and, of course, knows nothing about how it was damaged, except that he presumes that a submerged object was found lying over it and that this object might cause failure in the cable to operate properly. The sole ground of negligence, however, charged by plaintiff against defendants, is that the anchor of the ship Mai, when dropped, became entangled in and broke the cable.

5. Plaintiff has also produced an abstract of the log of the ship Mai, from which we quote the following:

"When the steamer was being put alongside the wharf the wind was so strong that the tug lacked sufficient power to get the 'Mai' up against the wind and it became necessary to drop port anchor to make the ship turn up.

"There was an American vessel lying at the wharf loading near by, and if the anchor had not been dropped the 'Mai' would have collided with this vessel.

"When the anchor was raised it was noticed that it caught in something. Upon being questioned the tugboat captain replied that at this place was lying a sunken lighter. When the anchor was up nothing was hanging on to it. The 'Mai' went right to the wharf and was moored at 2:30 p. m."

Captain Fritz John, a marine diver, testified that there are many wrecks in the Mississippi river, that he has dived at Jackson avenue, and that there are wrecks down there. Tr. 194.

William A. Bisso, president of defendant coal and towboat company, also testified that there are fifteen cables in the Mississippi river, between Napoleon avenue and Canal street. Tr. 126.

If a steamship is to be held liable in damages merely because its anchor, when necessarily cast, may possibly dislodge a derelict, or some part thereof, which may possibly float and settle upon one of the numerous cables in the Mississippi river, and put it out of commission, then it is evident that the right of plaintiff company to lay and op-

erate cables under that river is paramount to the right of vessels to navigate the same, fully and freely, except at their own risk and peril.

Such, however, is not the tenor of the permit secured by plaintiff company from the Secretary of War under section 10 of the Act of Congress, approved March 3, 1899 (33 US CA § 403), entitled "An Act Making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes."

Among the conditions upon which the above permit was granted to plaintiff company, it is expressly stipulated:

"(c) That there shall be no unreasonable interference with navigation by the work herein authorized."

"(e) That no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the work or structure."

And, in order that these conditions may be enforced efficiently and immediately, for the protection of full and free navigation, it is declared in the permit which plaintiff company holds "that this permit is revocable at will by the Secretary of War."

 Even if it be assumed from the log of the Mai that its anchor, when cast, struck and disturbed a derelict and caused it to settle later upon the cable of plaintiff company, and so damage it as to render it useless, it must be considered that the anchor was dropped by the Mai at a time and place demanding this action to prevent collision with another vessel, and at a point so distant from the cable of plaintiff company that no human prudence could well foresee any possible damage to the cable of plaintiff company.

Under the facts of this case, the cause of the damage is so remote as to bar plaintiff company from recovery, aside from the question of the right of the Mai to navigate the waters of the Mississippi fully and freely.

6. It is stated in the log of the Mai and also by all the witnesses in the case that the anchor, when raised, had nothing hanging on it. Nor was there any proof that it was broken in two.

It is shown by the evidence that the Mai had a patent anchor. Captain Grusich testified that, had this patent anchor caught in the cable, one of two things would have happened: Either the cable would have been broken in two, or it would have been pulled out of the water when the anchor was hoisted. The patent anchor would never have turned it loose. Tr. 165.

There is no proof of the alleged act of negligence relied upon by plaintiff company, nor do we find from the evidence adduced without objection any proof of any other act of actionable negligence, upon the part of either of the defendants.

It is therefore ordered that the judgment appealed from be annulled and reversed.

It is now ordered that plaintiff's demands against both defendants, Dampskibs Aktieselskabet Mai and New Orleans Coal & Bisso Towboat Company, Inc., be rejected, and that plaintiff's suit be dismissed at its costs.